FREDERICKA HOMBERG WICKER, Judge.
12Pefendant, Quang T. Do, appeals his eight convictions after a trial by jury on February 13, 2012. In his first assignment of error, defendant argues the trial court abused its discretion in refusing to order a new trial after three of the four alleged victims recanted their accusations against him. In his second assignment of error, defendant argues the law did not authorize his conviction under La. R.S. 14:43.4, for aggravated oral sexual battery, because La. R.S. 14:43.4 had been repealed for part of the time period during which the state alleges he committed this crime. For the following reasons, we affirm defendant’s convictions. Due to errors patent however, corrective action in necessary.
On counts one, two, three, four, and five, we vacate defendant’s sentences as imposed on February 19, 2013 and reinstate defendant’s original sentences on those counts as imposed on January 7, 2013. We also remand this matter to the trial court with instructions to. resentence defendant on count six. We further order |sthat, after this resentencing, defendant’s commitment and uniform sentencing commitment order be corrected to reflect defendant’s sentences and transmitted to the Department of Corrections and to defendant. We also instruct the trial court to notify defendant of his sex offender registration requirements. Separately, we order that a copy of this opinion be transmitted to the Clerk of Court for the Twenty-Fourth Judicial District Court and to the general counsel for the Department of Corrections.

PROCEDURAL HISTORY

On July 7, 2011, a Jefferson Parish Grand Jury returned an eight-count indictment charging defendant, Quang T. Do, with one count of aggravated rape in violation of La. R.S. 14:42[1] (count one), four counts of aggravated incest in violation of La. R.S. 14:78.1 (counts two, six, seven, *381 eight), one count of indecent behavior with juveniles in violation of La. R.S. 14:81 (count three), one count of aggravated oral sexual battery in violation of La. R.S. 14:43.4[2] (count four), and one count of sexual battery in violation of La. R.S. 14:43.1 (count five).
On July 11, 2011, defendant was arraigned and pled not guilty to all charges. The matter proceeded to trial on February 7, 2012; and on February 13, 2012, a 12-person jury found defendant guilty as charged on all counts. On March 2, 2012, defendant filed motions for new trial and post-verdict judgment of acquittal. On March 16, 2012, defendant filed an amended motion for new trial, which he subsequently supplemented on April 23, 2012. On November 26, 2012, the trial court denied defendant’s motion for post-verdict judgment of acquittal. On December 4, 2012, the trial court denied defendant’s motion for new trial.
[4On January 7, 2013, the trial court imposed sentence. On count one, defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. On count two, defendant was sentenced to fifteen years at hard labor. On count three, defendant was sentenced to seven years at hard labor. On count four, defendant was sentenced to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence. On count five, defendant was sentenced to ten years at hard labor without benefit of parole, probation, or suspension of sentence. On counts six, seven, and eight, defendant was sentenced to fifteen years at hard labor, on each count. All sentences were ordered to be served concurrently; and, as to counts two, six, seven, and eight, the court required defendant to bear the cost of counseling. Defendant’s motion for appeal was granted on January 9, 2013.
On February 19, 2013, on the court’s own motion, defendant was resentenced. On count one, defendant was resentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On count two, defendant was resentenced to fifteen years at hard labor, five years without benefit of parole, probation, or suspension of sentence. On count three, defendant was resentenced to seven years at hard labor. On count four, defendant was resentenced to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence. On count five, defendant was resentenced to twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence. On count six, defendant was resentenced to fifteen years at hard labor, five years without benefit of parole, probation, or suspension of sentence. On counts seven and eight, defendant was resen-tenced to twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence. These | .^sentences were ordered to be served concurrently and defendant was given credit for time served.

FACTS

At trial, the jury learned the following: L.B.[3] and defendant, though never legally *382 married, had been together since 1991 and have five children together, three girls, O.D., H.B., D.B., and two boys, H.D. and E.D. L.B., defendant, and their children lived in a townhouse on Lac Couture Drive in Harvey with two bedrooms upstairs and a living room and kitchen downstairs. The children shared one bedroom while L.B. and defendant shared the other.[4]
The family subsequently moved into a larger, four-bedroom residence on Brighton Place in Harvey. There, O.D. and D.B. shared one room; H.B. had her own room; and the boys, H.D. and E.D., shared one room. L.B. and defendant shared the master bedroom.
Defendant worked offshore and, as a result of Hurricane Gustav in 2008, was laid off. Since L.B. did not work, this put a financial strain on the family, which resulted in a foreclosure of the Brighton Place residence. Consequently, L.B. and the five children moved in with L.B.’s family. Because L.B.’s family never liked defendant, defendant moved in -with his sister. While L.B. and her children resided with her parents, there was a discussion about L.B.’s parents claiming the children for tax purposes.
At the time when L.B. and her children were living with her family, one of L.B.’s sisters, S.B., became “fed up” with L.B.’s failure to get a job, so she kicked her out. K.B., another of L.B.’s sisters, told the children that they were welcome to Rstay at their grandparents’ house or to go with their mother. During this discussion, K.B. asked D.B. and H.B.[5]: “How come you don’t like your dad?” D.B. responded: “I don’t know if I should tell you this, I have to ask [O.D.] first, but he did something.” K.B. approached O.D.[6] and asked her about what D.B.[7] had said.
After speaking with the girls, on February 24, 2011, K.B., along with O.D. and H.B., met with Louisiana State Trooper Joseph Patout. At this meeting, the girls disclosed allegations of sexual abuse, after which Trooper Patout scheduled forensic interviews at the Children’s Advocacy Center (CAC) for the girls.
On March 3, 2011, Erika Dupepe, a forensic interviewer with the Children’s Advocacy Center, interviewed O.D. and D.B.[8]
In O.D.’s CAC interview, her interview during a medical examination, her interview with the Department of Children and Family Services, and at trial, O.D. described substantially the same sequence of events. When O.D. was 10 years old in the fourth grade, she was cleaning the house on Lac Couture Drive when her father “put [her] down,” telling her that her sister is prettier than her. In response, O.D. went upstairs, put her head on a table, and tried not to think about it. Her father followed her upstairs and told her to sit on his lap. O.D. complied. Instructing her on how boys would touch her, defendant inserted his hand into O.D.’s shirt and began “feeling” and “rubbing” on O.D.’s *383 chest, causing O.D. to feel “uncomfortable.”
17After this incident, O.D. stated that similar incidents began to occur more frequently. At the Lac Couture residence, O.D. and her siblings slept in one room, in a red bunk bed. The bottom bunk was larger than the top; O.D. and D.B. shared the top, while her other siblings shared the bottom. On more than one occasion, while O.D.’s siblings were asleep, defendant came into the room and tried to touch O.D.’s bare breast. O.D. tried to push him off and told him: “No, leave me alone. I’m trying to sleep.” He replied: “Let me. Let me.” After touching her chest, defendant left the room.
As these incidents continued to occur, O.D. tried to lock herself in her room, but the lock was broken, so she placed a toy chest in front of the door so that every time the door was opened, she awakened and would know if her father was approaching. During her father’s advances, O.D. continued to push him away, telling him to leave.
One night around this time, O.D. was lying on the top bunk with her sister, D.B., and her other siblings beneath, when her father[9] entered the room and attempted to touch O.D.’s chest as he usually did, but she pushed him off. He then walked out of the room and into the bathroom, from where O.D. heard sounds of plastic and rubber, which she was “pretty sure” was a condom. Her father, who O.D. strongly believed to be drunk, soon re-entered the room and climbed onto the top bunk. He pulled down her pants and inserted his penis into her vagina. To get him off of her, O.D. clenched her vagina, constricting his penis and prompting her father to stop and leave the room. After this incident, defendant “stopped messing with” O.D.
Several years later, when O.D. was 14 or 15 years old, she informed her younger sister, H.B., of these incidents for the first time. O.D. asked her sister if | ^anything had happened to her and warned her to be careful around their father. Around this time, O.D. learned that her father had started trying to touch H.B. This prompted O.D. to tell her mother that her father was being a “pervert” and that he was trying to touch H.B. L.B. was “shocked to hear about it,” but after discussing it briefly, the subject was dropped. Around this time, while O.D. was using the computer at home, her father yelled at her for not cleaning up and being lazy. This angered O.D., which prompted her to confront him, saying: “You know what you did to me? You raped me.” In response to this, her father demanded that she go to her room. Later that night, defendant and his wife got into an argument about O.D.’s allegation wherein he denied ever doing such things.
D.B., in her CAC interview and at trial, stated that when she was five years old in kindergarten, she was lying in the top bunk with O.D., when her father, who was drunk, climbed on to the top bunk and touched and felt O.D. D.B. observed O.D. trying to push her father off and telling him “Get off of me.” As this happened, D.B., who became scared, turned the other way, curled into a ball, and closed her eyes and ears.
The day after O.D. and D.B. had provided their CAC interviews, on March 4, 2011, the girls’ aunt, K.B.,[10] who was “upset” by the situation, revealed to her boss that she too had been sexually abused by defen *384 dant. Her boss called Trooper Patout and informed him of this. K.B. then met with the trooper and informed him of the abuse she had experienced. On March 9, 2011, Trooper Patout conducted a recorded interview of K.B.[11] Subsequently, at trial, K.B. described the abuse.
One night around September 11, 2001, when K.B. was 10 years old, she was staying at her sister’s house on Lac Couture Drive and had fallen asleep downstairs 19on the couch with the television on. She awakened to defendant touching her “boobs area” under her shirt and her “vaginal area.” He pulled her pants down and kissed her “vaginal area,” putting his tongue inside her vagina. He then took her hand and placed it on his bare penis. K.B., feigning sleep throughout, pretended to wake up and went upstairs to try to sleep in the girls’ bedroom, where she lay on the bottom bunk with her two nieces. Five minutes later, defendant entered the room and resumed his advances. This time K.B. resisted, pushing, kicking, and screaming “Rape! Rape! Rape!” But nobody in the house responded. As defendant continued, K.B. eventually tired of resisting and “just let him do whatever.” O.D. and H.B., who lay next to K.B. in the same bed, did not stir during this episode. When defendant finished, he got up and walked out of the room. K.B. fell asleep and, the next morning, told L.B. that defendant “touched” her. L.B. didn’t say anything. On cross-examination, K.B. acknowledged that she did not see her assailant’s face, but she knew it was a man and she believed it was defendant because he smelled like beer and she recognized defendant’s curly hair.
L.N., K.B.’s cousin, testified that when they were young teenagers, K.B. told L.N. that her brother-in-law (defendant) had touched her. L.N. testified that she has no reason to lie.
On March 9, 2011, in H.B.’s CAC interview,[12] she described three incidents that had occurred with her father. When H.B. was eight or nine years old, her family was celebrating the first birthday of her youngest brother, E.D. After everybody had left, H.B. was watching television alone in the living room when her father, drinking beer, sat down next to her. He told her to sit on his lap. She did and he started “feeling on” her, lifted up her shirt, and kissed her chest. H.B. ran out of the room and upstairs to her bedroom, where she cried herself to sleep.
| ^Another time, when H.B. was 13 years old, she was in her bedroom when her father sat down next to her on her bed and spoke with her about boys, telling her not to let them “use” her. He demonstrated how boys would do this, touching H.B.’s back, breasts, and under her shorts.[13] During this incident, H.B.’s older sister, O.D., who was walking out of the bathroom, noticed H.B. and their father together, grabbed H.B. by the arm, and pulled her out of the room.
In another incident, when H.B. was 13 years old, she was sleeping in her bedroom *385 when her father entered the room, sat on her bed, inserted his hand under the blanket, touched H.B.’s back and her left buttock under her shorts. She swatted his hand away and told him to stop. But he did not. She screamed, ran downstairs, and joined O.D. in the living room.
After learning of the allegations of abuse from O.D., H.B., D.B., and K.B., on March 14, 2011, Trooper Patout obtained and executed an arrest warrant for defendant. Defendant speaks very little English, so Louisiana State Trooper Vincent Le-Nguyen, who is fluent in Vietnamese, assisted Trooper Patout with defendant’s arrest. Defendant was advised of his rights in Vietnamese with the aid of an advice of rights form.[14] After being advised of his rights, defendant signed the advice of rights form, indicating he understood his rights, waived them, and was willing to answer questions.[15]
Defendant denied the accusations against him. He explained that his three daughters and sister-in-law were alleging sexual abuse because L.B.’s family was trying to acquire custody of the children for tax purposes. Defendant described his daughter’s room as having a red bunk bed with a queen mattress on the bottom and Ina twin mattress on top. All of his daughters slept in this bunk bed. He denied ever getting in the bed with his daughters. He denied removing KjB.’s pants when she was 10 years old and kissing her vagina. Trooper Patout presented defendant with the question: “If I were to tell you that K.B.’s underwear is being tested for your DNA, what will be the result of that test?” Defendant responded: “If you find me guilty, then I’m guilty. But I didn’t do it.” Defendant maintained his innocence throughout the interrogation.
Two days after defendant’s arrest, on March 16, 2011, Kay Evans, an investigator with the Department of Children and Family Services (OCS), met separately with O.D., H.B., and D.B. O.D. explained that her father inserted his penis into her vagina when she was in fourth grade. H.B. told Ms. Evans that her father touched her breasts and kissed her neck area when she was eight or nine years old. And D.B. explained that she was in her bedroom at the time her father entered the room and touched O.D.
About a month after defendant’s arrest, on April 13, 2011, Anne Troy, a pediatric forensic nurse with the Audrey Hepburn Care Center at Children’s Hospital and an expert in the field of child sexual abuse, examined O.D.[16] During the examination, Ms. Troy obtained an incident history from O.D.[17] In this history, O.D. explained that when she was in fourth grade, she was on the top of her bunk bed sleeping when her father inserted his condom-clad penis into her vagina. Because she could not push him off of her, she “closed [her] vagina *386 really tight,” causing defendant to stop and leave the room. O.D. also described an incident when her father touched her chest area under her clothing.
|12Ms. Troy testified that her examination of O.D. revealed no definitive physical findings of sexual abuse, but she explained that in 95% of cases involving penile-vaginal penetration, even with a 10-year-old girl, there will be no medical evidence of the penetration. Ms. Troy also explained that delayed disclosure may occur for a multitude of reasons. For example, a child may “look to see if another sibling is at risk and then disclose or wait until the offender is moving out of the house.” Regarding recantation, Ms. Troy explained that some children, when divulging sexual abuse, are tentative and will reveal little “to see if the world explodes,” and if it does, they take it all back.
H.B. was also scheduled for a medical examination with Ms. Troy on April 13, 2011, but she refused to go. Ms. Troy explained that in cases where siblings in the same household are sexually assaulted by the same person, it is possible for the siblings to react differently depending on their age, personality, resiliency, and the frequency of the abuse.
At trial, H.B. described the three incidents of sexual abuse she had previously conveyed to the CAC interviewer and the police. When she was six or seven years old, H.B. was watching television when her father told her to sit on his lap and “kissed [her] breast,” under her clothes. When H.B. was around 11 years old, she was sitting on her bed, when her father, who had been downstairs with his friends, sat next to H.B., put his hand on her lower waist on top of her clothes, and talked to her about boys. And, the third incident occurred when defendant sat on the bed next to H.B. who was sleeping and touched her waist on top of her clothes.
Although H.B. acknowledged she had previously made these allegations, at the time of trial, she changed her story and recanted the allegations of sexual abuse. Regarding the incident that occurred during her brother’s birthday party, she testified that her father never kissed her breast. She stated that she was | iswatching television when her father joined her and told her to sit on his lap. She did and her father “put his arms on [her] left waist on top of [her] clothes. And that was it.” During direct examination, she explained that she had lied about these incidents because she was mad at her father:
H.B. also stated that her description to the school social worker that her father had fondled her breasts was not true.
H.B. explained that when her family’s home was foreclosed upon, she first blamed her father, but then after V.D., defendant’s adult son and H.B.’s older half-brother, told H.B. that the foreclosure was her mother’s fault, H.B. levied the blame on her mother.[18] H.B. explained that she learned the foreclosure was her mother’s fault a couple weeks after her CAC interview and after charges had been filed. Then, when V.D. informed H.B. that her father had been arrested, she decided to drop the charges. V.D. told H.B. that he believes defendant would never do what he was being accused of, so V.D. hired and paid for defendant’s attorney. H.B. also testified that she believes her sisters, O.D. and D.B., were lying.
*387 O.D. testified that no one tried to convince her to fabricate these allegations and that she had no reason to fabricate such things. In fact, O.D. admitted that despite everything, she still loves her father. Similarly, D.B. also testified that no one told her what to say or to fabricate anything regarding the allegations against her father. Despite everything, D.B. testified that she loves her father.
K.B. testified that she did not tell O.D. or D.B. to fabricate the allegations against defendant. She did not give them details or coach them on what to say. She also testified that she has no reason to fabricate her allegations against defendant.
|uThe defense called Vicki Esquivel, the principal of Paul J. Solis Elementary School, who testified that the school records of O.D. and H.B. admitted at trial did not contain any indication that either of the two girls had been referred to the school social worker during their time there. The defense also called Connie Gauchet, a fourth grade teacher at Paul J. Solis Elementary School, who testified that she taught O.D., H.B., and K.B., and that nothing stood out as unusual about any of the girls.
The state and defense entered into a stipulation whereby if Dr. Hai Nguyen were to testify he would testify that he examined K.B. various times between 2002 and 2010, he examined O.D. five times between 2004 and 2010, and he examined H.B. various times between 2004 and 2011, and that none of these individuals disclosed allegations of sexual abuse.

DISCUSSION

Assignment One

In his first assignment of error, defendant argues the trial court erred in denying his motion for new trial after three of the four alleged victims had recanted their allegations. In support of this, defendant points to H.B.’s trial testimony, O.D.’s testimony at the hearing on defendant’s motion for new trial, and D.B.’s affidavit which defendant attached to his motion for new trial.
As an initial matter, we find that the trial court only considered O.D.’s recantation when it considered and ruled on defendant’s motion for new trial. The trial court did not consider the other recantations by H.B. and D.B. in ruling on the motion for new trial. The trial court did not consider H.B.’s recantation because it found that considering it would be cumulative given that the jury had already passed judgment on her recantation at trial. The trial court also did not consider D.B.’s recantation by affidavit after D.B. refused to testify and the state objected to hr,the affidavit as impermissible hearsay.[19]. Defense counsel did not object to the trial court’s failure to consider the recantations of D.B. and H.B. at the motion for new trial hearing, nor does defense counsel object to that failure in this appeal. Due to defendant’s failure to object, the issue of whether the trial court erred in not considering H.B.’s and D.B.’s recantations in ruling on defendant’s motion for new trial is not preserved for appellate review by this Court. See Unf. R. Ct.App., R. 2-12.4. Therefore, we will consider whether the trial court erred in denying defendant’s motion for new trial in light of O.D.’s testimony at the hearing on that motion in which she recanted her previous allegations.
The Louisiana Code of Criminal Procedure, which sets forth the grounds for *388 seeking a new trial, provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the -defendant, was not discovered before or during the trial, is available, and if the evidence had- been introduced at the trial it would probably have changed the verdict or judgment of guilty;
La.C.Cr. P. art. 851.
As stated in State v. Prudholm, 446 So.2d 729, 735 (La.1984), La C.Cr.P. art. 854 establishes four requisites for a new trial motion based on newly discovered evidence: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial must not be due to defendant’s lack of diligence; (3) it must be material to the issues at the trial; and |1B(4) it must be of such a nature that it would probably produce an acquittal in the event of retrial. See also State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 21, unit denied, 11-0282 (La.6/17/11), 63 So.3d 1039.
The trial court’s application of these precepts to newly discovered evidence is entitled to great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. State v. Clayton, 427 So.2d 827 (La.1982). The Louisiana Supreme Court defined the trial court’s obligation in evaluating a motion for new trial in State v. Talbot, 408 So.2d 861 (La.1980), stating:
The scope of the trial judge’s duty toward the motion for a new trial based upon the new evidence must be kept in mind. It was not for him to determine the guilt of [another alleged suspect] or the innocence of [the defendant]; it was not for him to weigh the new evidence as though he were a jury, determining what is true and what is false. The judge’s duty was the very narrow one of ascertaining whether there was new material fit for a new jury’s judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts, raise debatable issues? Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial?
Talbot, 408 So.2d at 885.
More recently, in State v. Watts, 00-0602 (La.1/14/03), 835 So.2d 441, the Louisiana Supreme Court expanded on this definition, stating:
The test is objective in that the trial judge does not sit as the ultimate arbiter of the resolution of the case once the new evidence is considered, that is, the trial court does not weigh the evidence. The role of the trial court is to review the evidence constituting the State’s case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence.
Watts, 00-602, p. 7, 835 So.2d at 447 (footnote omitted).
Recantations of trial testimony should be looked upon with the utmost suspicion. State v. Tyler, 342 So.2d 574 *389 (La.1977), cert. den., 431 U.S. 917, 97 17S.Ct 2180, 53 L.Ed.2d 227 (1977). Absent special circumstances, to refuse to grant a new trial on such a basis is not an abuse of discretion. State v. Clayton, supra. This is because a recantation at a new trial is a confession to perjury which destroys the credibility of the witness. State v. Linkletter, 345 So.2d 452 (La.1977), cert. den., 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978).
In the evaluation of whether the newly discovered evidence warrants a new trial, the test employed is not simply whether another jury might return a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. State v. Molinario, 400 So.2d 596 (La.1981).
In this case, at the hearing on the motion for new trial, O.D. testified that she lied when she made her previous allegations against her father. Regarding her prior allegation that her father had inserted his penis into her one night, O.D. testified that defendant never touched her. She testified that defendant walked in her room, checked to see whether she was sleeping, and walked out. O.D. also specifically denied confronting defendant about the alleged rape while she was on the computer after defendant yelled at her for not cleaning.
O.D. explained that she fabricated her allegations because she was mad at defendant because they lost their house in a foreclosure and she viewed it as defendant’s responsibility to take care of those things as the “man of the house.” On cross examination, O.D. admitted that she had previously told the prosecution that she was telling the truth, but only wanted her father to get five years in prison instead of a life sentence.
Our review of the transcript shows the trial court conscientiously observed and weighed O.D.’s testimony. In its denial of defendant’s motion for a new trial, the trial court stated:
|18The Court has had the opportunity to review this matter in light of the Code of Criminal Procedure and other cases that the Court had reviewed and had the opportunity to sit through the trial in this matter. I heard the testimony of all of the witnesses in this matter. The Court finds that the testimony of the witness in this matter is incredible. I do not think that anything that she said made any sense. I think that in light of the sentencing issues in this matter, this Court believes that she came in, and she made up this whole story relative to her testimony in an effort to help her father at this stage of the proceedings. As such, the Court is going to deny the motion for a new trial. I note your objection to the Court’s ruling in this matter.
We find that in this reasoning and judgment, the trial court complied with its obligation in evaluating a motion for new trial. In State v. Hammons, 536 So.2d 598, 600-601 (La.App. 1 Cir. 11/22/1988), the First Circuit reversed a trial court’s denial of a defendant’s motion for new trial because the trial court failed to apply the proper test of determining whether a jury, considering the new evidence, would probably reach a different result. Rather, the trial court in Hammons reached its decision solely on its own determination that the defendant was guilty and that the new evidence was not credible. Id. Such is not the case here. Nothing in the record suggests that the trial court did not apply the correct legal test. We find this case to be more analogous to State v. Coleman, 05-1617 (La.6/29/07), 959 So.2d 465. In Coleman, the Supreme Court affirmed a trial *390 court’s denial of a motion for new trial when that trial court applied the correct standard and weighed the evidence to make its determination on that standard. Id. at 474.
Here, the record supports the trial court’s conclusion that O.D. fabricated her recanting testimony. When recanting her testimony, O.D. admitted she did not want to see her father sent to jail for life. Furthermore, O.D.’s recanting testimony is undermined by the un-recanted trial testimony of O.D.’s aunt, K.B., and O.D.’s mother, L.B., who both corroborated parts of O.D.’s original testimony. Specifically, L.B. testified that O.D. had told her that defendant had done something to her, O.D., that he was “not supposed to do.”
| ^Considering this, and after a thorough review of the record, we find the trial court did not abuse its discretion in denying defendant’s motion for a new trial. Therefore, defendant’s first assignment of error is without merit.

Assignment Two

In his second assignment of error, defendant argues his conviction on the fourth count against him, charging him with violating La. R.S. 14:43.4, was unauthorized by law because the indictment against him alleged he committed this violation “on or between” dates that were both before and after the legislature repealed La. R.S. 14:43.4 on August 15, 2001.[20] In relevant part, the indictment in this matter accuses defendant as follows:
COUNT 4) ... the District Attorney further gives the Court to understand and be informed that on or between February 01, 2001 and September 11, 2001, the said [defendant] violated R.S. 14.43.4 in that he did commit aggravated oral sexual battery upon known juvenile (DOB 05/23/91), wherein the victim was under the age of twelve (12) years old ... contrary to the form and Statute of the State of Louisiana, and against the peace and dignity of the State.
Under Louisiana law, it is well established that a defendant is to be tried under the statute in effect at the time of the commission of the crime. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166, 170 (citing La. R.S. 24:171).
Here, on and from February 1, 2001, through August 14, 2001, La. R.S. 14:43.4, in relevant part, criminalized the act of oral sex with a victim who did not give legal consent because that victim was under twelve years of age.[21] La. R.S. 2014:43.4 defined this conduct as “aggra *391 vated oral sexual battery.” Louisiana’s prohibition on conduct defined as “aggravated oral sexual battery” was simultaneously repealed and reenacted by La. Acts 2001, No. 301, § 2, effective August 15, 2001. Because of this Act, from August 15, 2001, through September 11, 2001, the conduct previously prohibited as “aggravated oral sexual battery” was prohibited as an act of “aggravated rape” under La. R.S. 14:41 and 42.[22] At no time relevant to this proceeding, was the conduct formerly prohibited by La. R.S. 14:43.4 as “aggravated oral sexual battery”, legal in Louisiana.
“That a statute is subsequently amended to modify or lessen the possible penalty does not extinguish liability for the offense committed under the former statute.” State v. Weaver, 805 So.2d at 170. “The repeal, re-enactment, or amendment of a penal statute does not extinguish or alter the liability for penalty of the former statute, unless the legislature so intends....” State v. Narcisse, 426 So.2d 118, 131 (La.1983) (quoting State v. Paciera, 290 So.2d 681, 687 (La.1974)).
Here, because the legislature in fact increased the penalty for the relevant prohibited conduct through La. Acts 2001, No. 301, § 2, there is no indication that it sought to extinguish liability under the previous statute. Where, as here, the legislature amends statute to increase the penalty for certain conduct, while at all times maintaining the illegality of the conduct, prosecution for the conduct such as the one against defendant are generally permitted. See State v. Perret, 628 So.2d 19192 (La.App. 5 Cir. 11/23/1993),[23] For these reasons, we find defendant’s second assignment of error to be without merit.

ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; *392 State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). This review revealed: first, the trial court failed to properly inform defendant of his prescriptive period for seeking post-conviction relief second, the trial court failed to notify defendant of his sex-offender registration requirements; and third, the trial court erred in several of the sentences it imposed upon defendant.
First, a review of the record reflects that defendant was not properly advised of the time delay within which to file an application for post-conviction relief. In the past, this Court has ordered the trial court to properly advise defendant of the prescriptive period under La.C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that defendant received the notice. However, in State v. Morris, 40,322 (La.App. 2 Cir. 1/25/06), 920 So.2d 359, 363, the Second Circuit corrected this error patent by way of its opinion rather than a remand. State v. Davenport, 08-463, p. 11 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 457. Accordingly, we hereby advise ^defendant, pursuant to La.C.Cr.P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. art. 914 or 922.
Second, the trial court failed to notify defendant of Louisiana’s sex offender registration and notification requirements pursuant to La. R.S. 15:540 et seq. and La. R.S. 15:543(A). As a result, we are remanding this matter to the trial court for the purpose of providing defendant with appropriate written notice of his sex offender registration and notification requirements. See, e.g., State v. Scott, 42,997 (La.App. 2 Cir. 2/13/08), 975 So.2d 782. We instruct the trial court to inform defendant of his registration and notification requirements by using the form contained in La. R.S. 15:543.1.
Third, our review for errors patent reveals the trial court erred in several of the sentences it imposed on defendant when it first sentenced defendant on January 7, 2013, and then when it resentenced defendant, on its own motion, on February 19, 2013.
Louisiana Code of Criminal Procedure article 881(A) permits a sentencing court to amend or change sentences that are otherwise legal in every respect, prior to the beginning of execution of the sentence. The Louisiana Supreme Court has recognized the day after imposition of sentence as the beginning of execution of a hard labor sentence. See State v. Guajardo, 428 So.2d 468, 470 (La.1983) (citing La. R.S. 15:566.2). Since defendant was originally sentenced on January 7, 2013, he commenced execution of his sentences on January 8, 2013. At this point, the trial court was divested of the authority to amend or change defendant’s sentences under La.C.Cr.P. art. 881. However, if those sentences were illegal, La.C.Cr.P. art. 882 authorized the court to correct them.
laaOn review, we find that defendant’s original sentences on counts one, two, three, four, and five were legal. Therefore, pursuant to La.C.Cr.P. art. 881, the trial court lacked authority to amend those sentences. Accordingly, we hereby vacate defendant’s sentences on counts one, two, three, four, and five, as imposed on February 19, 2013, and we reinstate his original sentences on those counts as imposed on January 7, 2013. See State v. Reviere, 99-3118 (La.4/7/00), 759 So.2d 79; State v. Neville, 95-0547, pp. 4-5 (La.App. 4 Cir. *393 5/16/95), 655 So.2d 785, 788, writ denied, 95-1521 (La.9/29/95), 660 So.2d 851.
As to counts six, seven, and eight however, we find that the trial court’s original sentences on January 7, 2013 were illegally lenient, and therefore, La.C.Cr. P. art. 882(A) authorized the trial court to correct defendant’s sentences on those counts.
As to count six, charging defendant with aggravated incest, both defendant’s original sentence and his amended sentence were illegally lenient. The record before us shows that count six arises from the first incident of sexual abuse H.B. alleged against defendant. During her C.A.C. interview, H.B. alleged defendant abused her for the first time during E.D.’s first birthday party. The record shows that E.D.’s first party occurred November 13, 2007. Combined, the record reflects that the abuse, which resulted in defendants being charged with count six in this matter, occurred on or around November 13, 2007. At this time, La. R.S 14:78.1 provided that defendant’s conviction on count six for aggravated incest was punishable by “imprisonment at hard labor for not less than twenty-five years nor more than life imprisonment.” The statute further provided that at least “twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.” Therefore, defendant’s original sentence on this count, to fifteen years at hard labor, was illegally lenient, and the trial court l^was authorized to correct that sentence. However, when the trial court resentenced defendant, it imposed another illegally lenient sentence; fifteen years at hard labor, five years without benefit of parole, probation, or suspension of sentence.
Because we find the trial court erred in imposing an illegally lenient sentence on count six against defendant, we hereby vacate defendant’s sentence on count six. We remand this matter to the trial court with instructions to impose a legal sentence upon defendant on count six pursuant to La. R.S. 14:78.1.
Turning to counts seven and eight, defendant was charged on these counts with aggravated incest in violation of La. R.S. 14:78.1, where the offenses were alleged to have been committed on or between April 2, 2008 and July 1, 2010. During this span of time, the penalty provision was amended by La. Acts 2008, No. 33, § 1, eff. Aug. 15, 2008, such that before the amendment it provided:
Whoever commits the crime of aggravated incest on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than life imprisonment. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.
After this amendment, the statute read:
Whoever commits the crime of aggravated incest on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.
Defendant’s original sentences on counts seven and eight were each fifteen years at hard labor. Under both versions of the law in effect during the pertinent period, it is apparent these sentences were illegally lenient. Therefore, pursuant to La. C.Cr.P. art. 882(A), the trial court possessed the authority to correct these sen *394 tences. The court did this when it resen-tenced defendant on each of these counts to twenty-five years at hard labor without | ^benefit of parole, probation, or suspension of sentence. As these sentences are compliant with both versions of the law, we hereby affirm defendant’s sentences on counts seven and eight as imposed on February 19, 2013.

CONCLUSION

For the foregoing reasons, we affirm defendant’s convictions. Furthermore, we hereby advise defendant, pursuant to La. C.Cr.P. art. 930.8, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if defendant files it more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. art. 914 or 922.
However, due to the trial court’s error in failing to instruct defendant about his sex offender registration and notification requirements, we remand this matter to the trial court and instruct it to inform defendant pursuant to La. R.S. 15:540 et seq. Furthermore, due to the errors patent in sentencing, we vacate the sentences imposed on defendant for counts one, two, three, four, and five imposed on February 19, 2013 and reinstate defendant’s previous sentences on those counts which were imposed on January 7, 2013. As to count six against defendant, we find that both of the sentences imposed on defendant were illegal. We order the trial court to impose a legal sentence on defendant on this count. We affirm the trial court’s sentences on defendant on counts seven and eight.
We further order that, after this resen-tencing, defendant’s commitment and uniform sentencing commitment order be corrected to reflect defendant’s sentences and transmitted to the department of corrections and to defendant. Separately, we order that a copy of this opinion be transmitted to the Clerk of Court for the 12(iTwenty-Fourth Judicial District Court and to the general counsel for the Department of Corrections.

CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART AND VACATED IN PART; REMANDED.

. Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), opinion modified on denial of reh'g, 554 U.S. 945, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008) held portions of La. R.S. 14:42 unconstitutional. However, the unconstitutional portions are not relevant to the instant matter.

. La. R.S. 14:43.4 prohibited Aggravated Oral Sexual Battery until its repeal by Acts 2001, No. 301, § 2. The crime of Female Genital Mutilation, added by La. Acts 2012, No. 207, § 1, currently bears the statutory designation of La. R.S. 14:43.4.

. To observe the principle of protecting minor victims and victims of sexual offenses set forth in LA-R.S. 46:1844(W)(3), the victim and any witness whose name can lead to the victim's identity, i.e., parent, sibling, or relative with the same last name as the victim, will be identified by initials only.

. During this time, the youngest child, E.D., who was born on November 13, 2006, did not share this room with his siblings.

. H.B.’s date of birth is June 7, 1996. The transcript of H.B.’s trial testimony states that H.B.’s date of birth is June 7, 1986. However, this appears to be a transcription error since H.B. testified that she was 15 years old on February 9, 2012. Also, in her CAC interview, H.B. testified that her date of birth is June 7, 1996.

. O.D.’s date of birth is April 21, 1995.

. D.B.’s date of birth is July 7, 1999.

. These interviews were recorded. The DVD recording of O.D.’s interview was introduced into evidence as State's Exhibit 7 and published to the jury. The DVD recording of D.B.’s interview was introduced into evidence as State’s Exhibit 8 and published to the jury.

. O.D. testified that she knew it was her father because she saw his face.

. K.B.'s date of birth is May 23, 1991. K.B. is L.B.’s younger sister and the aunt of O.D., H.B., and D.B.

. The transcript of this interview was introduced into evidence as State's Exhibit 3. The recording was introduced into evidence as State's Exhibit 6. It was not published to the jury, but was introduced for record purposes only.

. The DVD recording of the interview of H.B. was introduced into evidence as State's Exhibit 9 and published to the jury.

.When describing this incident in her CAC interview, H.B. offered two differing accounts. In one, she said her father touched her back. In the other, she said her father touched her breasts and underneath her shorts.

. The advice of rights form was introduced into evidence as State’s Exhibit 4.

. Defendant’s statement was recorded on video. This recording was introduced into evidence as State’s Exhibit 5 and was published to the jury.

. Anne Troy was also qualified as an expert in the fields of child abuse, pediatrics, delayed disclosure, and physical findings in child sexual and physical abuse.

.This incident history was recorded. A transcript of this recording is- included in State’s Exhibit 10. There appears to have been errors regarding the labeling of exhibits. At trial, the state introduced the medical records from Children’s Hospital as State’s Exhibit 11 and referred to it as such. However, these medical records are labeled State’s Exhibit 10. This memorandum will refer to the Children’s Hospital medical records as they are labeled, i.e., State's Exhibit 10.

. The record does not indicate V.D.'s surname. However, since V.D. is defendant’s son, this opinion presumes he shares his father’s surname, and therefore refers to him as V.D.

. Although scheduled to testify at the second day of the motion for new trial hearing, D.B. chose not to testify.

. Furthermore, the record in this case is inconclusive as to whether defendant committed the acts alleged in Count IV against defendant before or after August 15, 2001.

. At the time of the offense, LSA-R.S. 14:43.4 provided in pertinent part:
A. Aggravated oral sexual battery is an oral sexual battery committed when the intentional touching of the genitals or anus of one person and the mouth or tongue of another is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1)When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
(5) When two or more offenders participated in the act without the consent of the victim.
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.

. Oral sexual intercourse was "aggravated” under the previous La. R.S. 14:43.4 when, inter alia, the victim of the conduct was "under the age of twelve years.” La. R.S. 14:43.4(A)(4), repealed by 2001 La. Act No. 301 § 2. Under the new law however, oral sexual intercourse constitutes aggravated rape when the victim of the conduct is “under the age of thirteen years.” La. R.S. 14:42(A)(4). This difference is not relevant to the case at bar however because the victim in this case was nine and ten years old during the period of time the state alleged defendant committed the violating conduct.

. State v. Babbitt, 457 A.2d 1049 (R.I.1983) (where rape statute repealed without saving clause when sexual assault statute enacted, prosecution under the former not barred, as "every element needed to prove a violation under the old statute for rape is also needed to prove first-degree sexual assault”); Ex parte Mangrum, 564 S.W.2d 751 (Tex.Crim.App.1978) (prosecution permissible under repealed welfare fraud statute, as it repealed at time of enactment of new theft statute, and "the constituent elements of the offense are substantially the same”).
Compare State v. Souza, 456 A.2d 775 (R.I.1983) (prosecution barred, as new sexual assault statute not mere reenactment of old indecent assault statute, as new law but not old requires purpose of sexual gratification).
Daker v. Williams, 279 Ga. 782, 621 S.E.2d 449 (2005) (defendant's prosecution for aggravated stalking not barred by amendment of statute prior to final judgment on conviction where, as here, defendant’s conduct covered by "both the original definition of the crime and the revised definition”); State v. Young, 107 Hawai’i 36, 109 P.3d 677 (2005) (although instant case not within general saving statute because prosecution not "pending" at time of repeal of statute, since at time of repeal the statute was "substantially reenacted,” prosecution under old law permissible); State v. Pereira, 973 A.2d 19 (R.I.2009) (prosecution under repealed sexual assault statute proper where there was a simultaneous reenactment, with the elements of the crime remaining the same but the penalty increased; increase in punishment for like offenders does not show legislature "meant to pardon all previous offenders”).